IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAVENWOOD HEALTHCARE, INC.         *

        Plaintiff          *

      vs.                 * CIVIL ACTION NO. MJG-06-3059

STATE OF MARYLAND, DEPARTMENT *
OF HEALTH AND MENTAL HYGIENE
                          *

        Defendant
*       *       *       *       *       *       *       *       *

DECISION ON APPEAL

    The Court has before it Ravenwood Healthcare, Inc.'s

("Ravenwood") Appeal [Paper 9] of a final order of the United

States Bankruptcy Court for the District of Maryland (Schneider,

J.), Ravenwood's Motion to Strike Factual Exhibits Attached to

Appellee's Brief [Paper 14], and the State of Maryland,

Department of Health and Mental Hygiene's (the "State") Motion to

Dismiss [Paper 19], and the materials related thereto.  The Court

has considered the materials submitted by the parties, has

conducted a hearing and has had the benefit of the arguments of

counsel.


I.   BACKGROUND

    A.   Procedural Posture

    On June 13, 2002, Appellant Ravenwood, a not-for-profit

doing business as Ravenwood Nursing and Rehabilitation Center,

filed a petition for bankruptcy protection.  On March 30, 2004,

Ravenwood initiated an adversary proceeding against the State

pursuant to sections 541, 542 and 550 of the Bankruptcy Code seeking $971,410.10 in Medicaid funds that Ravenwood claimed the State of Maryland improperly withheld from it.[1]

After the completion of discovery, both the State and Ravenwood filed motions for summary judgment.  On October 12, 2006, the Bankruptcy Court granted summary judgment in favor of the State and denied Ravenwood's motion.  This appeal followed.


B.   <u>Medicaid</u>

The Federal Medicaid Program, 42 U.S.C. §1396 <u>et seq</u>. ("Medicaid") provides federal and state funding for individuals who are unable to afford medical care.  Medicaid was instituted in 1965 with the passage of Title XIX of the Social Security Act (SSA), as added 79 Stat. 343, 42 U.S.C. § 1396 <u>et seq</u>. (2000 ed. and Supp. III).  <u>See</u> <u>Arkansas Dep't of Health and Human Servs. v. Ahlborn</u>, 547 U.S. 268, 126 S. Ct. 1752, 1758 (2006).  Although states are not required to participate in the Medicaid program, they all do.  <u>Id.</u>  The federal government covers between 50-83% of patient care costs, while the states also pay a portion.  <u>Id.</u> Even though numerous federal requirements govern the administration of  Medicaid, the states do have some discretion in how they will expend Medicaid funds.  <u>See</u> <u>Cmty. Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132, 134 (2d Cir. 2002)(citing <u>Schweiker</u>

------

[1]  Since filing the Complaint, the State paid Ravenwood $495,097.20, leaving $476,312.90 in dispute.  <u>See</u> Appellant's Brief [Paper 9] at 2.

<u>v. Gray Panthers</u>, 453 U.S. 34, 36-37 (1981)).  The Eleventh
Circuit has explained that:

> Medicaid is a cooperative venture of the state and
> federal governments. A state which chooses to
> participate in Medicaid submits a state plan for the
> funding of medical services for the needy which is
> approved by the federal government. The federal
> government then subsidizes a certain portion of the
> financial obligations which the state has agreed to
> bear. A state participating in Medicaid must comply
> with the applicable statute, Title XIX of the Social
> Security Act of 1965, as amended 42 U.S.C. § 1396, <u>et
> seq.</u>, and the applicable regulations.

<u>Silver v. Baggiano</u>, 804 F.2d 1211, 1215 (11th Cir. 1986).

In Maryland, Medicaid is funded with equal parts of federal
and state money.  The federal government requires Maryland to
provide  nursing facility services for Medicaid recipients.  <u>See</u>
42 U.S.C. § 1396d (a)(4)(A).  Each Medicaid provider of nursing
facility services enters into a "Provider Agreement" with the
State of Maryland agreeing to be bound by the State's policies
and regulations, including the Medicaid reimbursement system.
The Provider Agreement remains in effect until the provider's
Medicaid participation ends.

Medicaid providers in Maryland are reimbursed their allowed
costs at the end of the fiscal year.  Interim payments, based on
the prior year's reimbursed costs and other factors, are made to
the Medicaid provider during the year.  <u>See</u> COMAR 10.09.10.07(C).
At the close of the fiscal year, the State's accountant audits
the provider's costs and reconciles the interim payments with the
actual amount of allowable costs to be reimbursed to a facility.
<u>Id.</u>  After the audit has been completed, the State issues the

Medicaid provider a "Final Cost Settlement," which sets forth the final calculation of the facility's Medicaid reimbursement. COMAR 10.09.10.14. The Final Cost Settlement notifies the provider whether it has been overpaid or underpaid by the interim payments made throughout the year and gives appeal rights. Overpayments must be returned to the State.  COMAR 10.09.10.26(B).  If the Medicaid provider has been underpaid, the State of Maryland must reimburse the provider the amount of the shortfall.   COMAR 10.09.10.14(D).


II.  <u>STANDARD OF REVIEW</u>

     When a District Court reviews a Bankruptcy Court final Order, the District Court acts as an appellate court.  Matters within the Bankruptcy Court's discretion are reviewed under an abuse of discretion standard.  <u>In re Arnold</u>, 806 F.2d 937, 938 (9th Cir. 1986).  That is, the Bankruptcy Court's decisions within its discretion will be reversed only if they were "based on an erroneous conclusion of law or when the record contains no evidence on which the [Bankruptcy Court] rationally could have based [the decisions]."  <u>In re Windmill Farms, Inc.</u>, 841 F.2d 1467, 1472 (9th Cir. 1988) (citing <u>In re Hill</u>, 775 F.2d 1037, 1040 (9th Cir. 1985)).  Accordingly, legal conclusions are reviewed <u>de novo</u>, whereas findings of fact may be set aside only if clearly erroneous.  <u>See In re Bulldog Trucking, Inc.</u>, 147 F.3d 347 (4th Cir. 1998).

A grant of summary judgment by the Bankruptcy Court is reviewed by the District Court <u>de</u> <u>novo</u> under the standards prescribed by Rule 56 of the Federal Rules of Civil Procedure. Pursuant to Rule 56, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  Only "facts that might affect the outcome of the suit under the governing law" are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Id.</u>

III. <u>DISCUSSION</u>

   A.   <u>Recoupment in Medicare/Medicaid Context</u>

   In the bankruptcy context, it has been said that: "Recoupment is the right of a defendant to have a plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim."  <u>See</u> <u>Powell v. FELRA and UFCW Health and Welfare Fund (In re Powell)</u>, 284 B.R. 573, 576 (Bankr. D. Md. 2002) (quoting <u>First Nat'l Bank of Louisville v. Master Auto Serv. Corp.</u>, 693 F.2d 308, 310, n.1 (4th Cir. 1982)).  The doctrine of equitable recoupment is not limited to the bankruptcy context.  For example, in the tax context, the doctrine is

5

applied to allow a party to avoid an inequitable consequence that would result from the strict application of normally applicable limitations  See Bull v. United States, 295 U.S. 247 (1935); Stone v. White, 301 U.S. 532 (1937).  In bankruptcy, the doctrine can be applied to avoid an inequitable consequence of the strict enforcement of the "border" between pre and post-petition actions.

The automatic stay in bankruptcy imposed by 11 U.S.C. §362 does not prevent the application of the equitable doctrine of recoupment.  In re Powell, 284 B.R. at 575.  Judicial approval is not required prior to recoupment because the "'right of recoupment does not constitute a debt which is dischargeable.'" Id. (quoting Aetna Life Ins. Co. v. Bram, 179 B.R. 824, 827 (Bankr. E.D. Tx. 1995)).

"Recoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date." Sims v. United States Dept. of Health and Human Servs. (In re TLC Hosps., Inc.), 224 F.3d 1008, 1011 (9th Cir. 2000)(citing 5 Collier on Bankruptcy ¶ 553.10 at 553-104).  In order for the doctrine of recoupment to apply, "'both the creditor's claim and the amount owed to the debtor must arise from a single contract or transaction.'" In re Powell, 284 B.R. at 576 (quoting Kosadnar v. Metro. Life Ins. Co., 157 F.3d 1011, 1013 (5th Cir. 1998)).

Courts have recognized two different, somewhat inconsistent, tests in determining whether a creditor's claim arises from a single contract.  The first, the logical relationship test, provides a flexible approach concentrating on the relationship between the creditor and debtor.  Under the logical relationship test "a transaction may include a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."  In re Powell, 284 B.R. at 576-77.  A second, more restrictive, test is "the integrated transaction test."  Pursuant to the integrated transaction test "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."  Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1081 (3rd Cir. 1992).

There is a split of authority on whether Medicaid or Medicare overpayments to a recipient and offsetting subsequent underpayments are considered part of one transaction for purposes of recoupment in bankruptcy.  Currently, the Third Circuit applies the integrated transaction test and concludes that each yearly payment to a Medicare provider constitutes a separate transaction.  See Univ. Med. Ctr., 973 F.2d at 1081.  However, the First, Ninth and District of Columbia Circuits hold that Medicare overpayments and subsequent post-petition underpayments to the same recipient are all part of the same transaction even though not in the same year.  See Slater Health Ctr., Inc. v.

7

United States (In re Slater Health Ctr., Inc.), 398 F.3d 98 (1st Cir. 2005); In re TLC Hosps., 224 F.3d at 1013; United States v. Consumer Health Servs. of America, Inc., 108 F.3d 390 (D.C. Cir. 1997).  The Fourth Circuit has not yet adopted either test, and lower courts within this Circuit have taken inconsistent positions.

The initial Circuit Court of Appeals to examine the issue of recoupment in the context of Medicare or Medicaid was the Third Circuit.  In In re University Medical Center, the Third Circuit considered whether the Department of Health and Human Services ("HSS") could withhold post-petition Medicare payments to University Medical Center ("UMC") in an attempt to recover pre-petition overpayments.  The Third Circuit concluded that for purposes of recoupment, payments made for services in one year were not part of the same transaction as payments for services in later years.  See 973 F.2d at 1081.  The court stated:

> [t]he relationship between HHS and a Medicare provider entails transactions that last over an extended period. However, each of these transactions begins with services rendered by the provider to a Medicare patient, includes payment to the provider, and concludes with HHS's recovery of any overpayment. Recovery of the 1985 overpayment, therefore, is the final act of the transactions that began in 1985. UMC's 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions. To conclude that these claims arose from the same transaction for the purposes of equitable recoupment would be to contort that doctrine beyond any justification for its creation. We conclude that the Department's post-petition withholding of the amount

8

previously overpaid to UMC cannot be considered as
equitable recoupment.

Id. at 1081-82.

In Consumer Health Services, the District of Columbia
Circuit reached a contrary conclusion.  See 108 F.3d at 394-95.
The Consumer Health Services court looked to the wording of the
Medicare statue to determine that post-petition payments to the
provider could be withheld to recoup Medicare overpayments made
pre-petition because they were part of the same transaction.  108
F.3d at 395-96.  The court noted:

> [s]ince [the Medicare statute] requires the Secretary
> to take into account pre-petition overpayments in order
> to calculate a post-petition claim . . . . Congress
> rather clearly indicated that it wanted a provider's
> stream of services to be considered one transaction for
> purposes of any claim the government would have against
> the provider.  The Third Circuit said that '[t]he [pre-
> petition] overpayments ... cannot be deemed advance
> payments for [the provider's subsequent] services.' [In
> re Univ. Med. Ctr., 973 F.2d at 1081.]  That
> observation, in our view, is contrary to manifest
> congressional intent.

Id. at 395.  Hence, the District of Columbia Circuit found that,
even under the more restrictive integrated transaction test,
post-petition services and pre-petition overpayments for services
constituted one transaction for recoupment purposes.  Id.

The Ninth Circuit applied the logical relationship test and
agreed with the District of Columbia Circuit's Consumer Heath
Services analysis.  See In re TLC Hosps., 224 F.3d at 1013.  The
TLC Hospitals court reasoned:

9

[t]he fact that the overpayments and underpayments
relate to different fiscal years does not destroy their
logical relationship or indicate that they pertain to
separate transactions. The Medicare statute creates a
sufficient relationship between different cost years to
permit recoupment. . . . [T]he fiscal intermediary
generally will not begin an audit until after the
provider has supplied its cost report. This cost report
is not due until five months after the conclusion of
the reporting period.   42 C.F.R. § 413.24(f)(2).
Consequently, a reality of the complex Medicare system
is that any overpayments will not be discovered, and
accordingly the 'retroactive adjustment' will not
occur, until after the end of the cost year in which
the overpayments were made. The timing of the audit is
not material to the logical relationship between the
overpayments and underpayments.

Id.   The court added:


[s]ound equitable considerations support HHS's right to
recoup. The Medicare system reimburses estimated costs
without waiting for an audit in order that providers
like TLC may maintain a cash flow; those providers
would otherwise find it difficult or impossible to
function. Overpayments (and underpayments) are inherent
in that system. It is fair for HHS to adjust for such
overpayments in the operation of that system whether or
not a bankruptcy has intervened. If a provider in
bankruptcy does not wish to be subject to Medicare's
system of adjustments, it can cease providing Medicare
services. If it chooses to continue to provide those
services during bankruptcy, it is not inequitable for
the bankrupt or its creditors that those services be
provided on the same, generally favorable, terms as
those governing other providers.

Id. at 1014.

    In Holyoke Nursing Home, Inc. v. Health Care Financing

Administration (In re Holyoke Nursing Home, Inc.), 372 F.3d 1, 4

(1st Cir. 2004), the First Circuit allowed recoupment because it

found that prior overpayments to the bankrupt Medicare provider

were part of the same transaction as the provider's reimbursement

claim for post-petition medical services.  372 F.3d at 4.  In
reaching this conclusion, the First Circuit agreed with the
position taken by the District of Columbia Circuit and the Ninth
Circuit on this issue and noted that their position has been
"embraced by the overwhelming majority of district and bankruptcy
courts nationwide."  Id.; see also In re Slater Health Ctr., 398
F.3d at 105 (holding that Medicare payments spanning several
years constitute one transaction, thereby allowing recoupment in
bankruptcy).

　　　In In re District Memorial Hospital of Southwestern North
Carolina, Inc., 297 B.R. 451 (W.D.N.C. 2002), the District Court
for the Western District of North Carolina adopted the reasoning
of the Consumer Health Services and In re TLC Hospitals decisions
and held that post-petition Medicaid payments could be withheld
to recoup pre-petition overpayments because the payments all
stemmed from one transaction.  297 B.R. at 456.  In re District
Memorial Hospital, like this case, concerned Medicaid payments.
In reaching its decision, the court disagreed with two earlier,
unreported bankruptcy court opinions from the same district, In
re Quality Link-Bertie, LP, 2001 WL 34388128 (Bankr. W.D.N.C.
2001) and In re Colonial Health Investors, LLC, 2001 WL 34388127
(Bankr. W.D.N.C. 2001). See In re Dist. Mem. Hosp., 297 B.R. at
455.

　　　Both In re Quality Link-Bertie and In re Colonial Health
Investors, like the instant case, involved Medicaid payments.
The bankruptcy court in those cases adopted the reasoning of the

11

Third Circuit in holding that recoupment was not available because the payments and reimbursements did not arise from the same transaction.

This Court agrees with the majority view and the Bankruptcy Court below that the pre-petition and post-petition payments amount to one transaction.   Thus, it holds that recoupment is appropriate.

Although this case involves Medicaid, not Medicare, this distinction is irrelevant.[2]   The court in In re District Memorial Hospital noted:

> [t]he federal law that created the Medicaid Program and engendered the State Medicaid Program provided for recoupment of overpayments made to the States. In accordance with the requirements for implementing Medicaid in this State, North Carolina statutes and regulations provide for recoupment of overpayments made to health care providers. The continuous balancing process outlined in the parties' Provider Agreement is based on these federal and state law provisions. Therefore, application of the rules from Consumer Health Serv. and TLC Hosps. requires a holding that the ongoing stream of services, advances, and reconciliations constitutes a single transaction, and that recoupment be allowed in this case.

297 B.R. at 456.

It is noteworthy that Medicare cost principles of reimbursement are applied to Maryland's Medicaid program, unless those provisions conflict with Maryland regulations.   See e.g. COMAR 10.09.10.08(B)(1); COMAR 10.09.10.09(B)(1); COMAR 10.09.10.10(B); COMAR 10.09.10.07(C)(5).   Further, as in the

---

[2]   The decisions from the First, Third, Ninth and D.C. Circuits dealing with recoupment in the Medicare context did not address Medicaid.

Medicare recoupment cases, there is one Medicaid Provider Agreement at issue in this case.[3]  The State makes interim payments to its Medicaid providers and reconciles those payments with the provider's actual costs on an annual basis.  If payments to the provider exceed the provider's costs, the State is entitled to reimbursement of the excess funds.  Thus, the operation of the Maryland Medicaid program does not differ in any material way from the operation of the federal Medicare program, and therefore, the treatment of payments to bankrupt providers likewise should not differ.

Equitable principles support recoupment in this case.  As noted above, the Medicaid system is premised on continuous payments and reconciliations that span fiscal years.  This system gives those providers the cash flow they need to furnish services throughout the year.  Overpayments occur routinely.  It would be inequitable to deny the State the right to recoup those overpayments from current reimbursements when the Medicaid provider continues to receive the benefits of the Medicaid program.

B.   SB 794

Although Ravenwood and the State dispute the exact nature of funds made available to Maryland nursing facilities under

---

[3]  Ravenwood and the State entered into the Medicaid Provider Agreement in 1996.

Senate Bill 794 ("SB 794"), any such dispute is not material to the resolution of this matter.

Ravenwood claims that the $476,312.90 it seeks from the State is primarily payment under SB 794 for nursing services. Ravenwood also claims that those SB 794 funds differ from other Medicaid funds and, in fact, were not even eligible for the federal Medicaid match. Ravenwood argues that because of the special nature of SB 794 funds, the State is unable to recoup overpayments for pre-petition general Medicaid costs from the current payment of SB 794 funds owed to Ravenwood.

The State disputes Ravenwood's characterization of both the payments currently owed Ravenwood as well as the nature of SB 794 funds. First, the State denies that the payments owed Ravenwood involve SB 794 monies. Rather, the State maintains that the current payments are for services that should have received a special reimbursement rate under the communicable disease incentive payment program. See Appellee's Brief [Paper 10] at 32. Second, the State argues that even if the current payments are for services under SB 794, there is no reason to treat those payments any differently than payments for any other Medicaid-eligible costs. Id.

Undeniably, Medicaid regulations can be complex. They authorize reimbursement for many different types of provider services. This Court is unaware of any other court basing recoupment on the specific types of services being reimbursed. Even assuming that the $476,312.90 currently owed Ravenwood

14

represents payment for SB 794 services, and even if SB 794
services were in some way "special" or different from other
services receiving federal Medicaid funds, the State is entitled
to recoup prior overpayments from the payments currently due
Ravenwood.  It would be unsound to limit the application of the
doctrine of equitable recoupment to a situation in which, within
a single transaction, an overpayment for a specific type of cost
was recouped only by reducing a later payment for the same
specific type of cost.  It is sufficient that the overpayment
and later underpayment are of Medicaid payments.

    C.   <u>Jurisdiction</u>

       1.   <u>Exhaustion of Administrative Remedies</u>

    The State argues that this Court has no jurisdiction to
entertain disputes over the amount currently due Ravenwood under
the Medicaid program because federal courts have no jurisdiction
to review regulatory actions undertaken by state health
departments administering programs like Medicaid.  <u>See</u>
Appellee's Brief [Paper 10] at 38-47.  It is true that under
federal regulations states must provide administrative review
for Medicaid provider disputes over payment rates.  <u>See</u> 42
C.F.R. § 447.253(e).  Maryland therefore provides for
administrative review of the State's cost determinations under
the Medicaid program.  <u>See</u> COMAR 10.09.10.14.  However,
Ravenwood does not dispute the <u>amount</u> of current payments or

prior overpayments, and therefore, the sole issue to be decided is whether recoupment is available to the State.[4]

In <u>University Medical Center</u> the court determined that the Bankruptcy Code provided jurisdiction under 28 U.S.C. §§ 157, 158, and 1334 and that the appeal was proper under 28 U.S.C. §§ 158(d) and 1291.  973 F.2d at 1072.  The court reached this conclusion by finding that the dispute did not "arise under" the Medicare statute.[5]  <u>Id.</u>  In so finding, the court noted that neither party disputed the amount of the reimbursement.  <u>Id.</u> at

---

[4]  To be sure, Ravenwood disputes the timing and calculation of the recoupment.  Ravenwood maintains that the State improperly recouped $327,741 for fiscal year ("FY") 2000 because Ravenwood had appealed the State's FY 2000 audit and that appeal was pending when the State recouped its money.  <u>See</u> Appellant's Brief [Paper 9] at 9-11.  Ravenwood argues that its debt of $327,741 should have been eliminated under relevant Maryland regulations during the pendency of the appeal.  <u>Id.</u>  Although Ravenwood acknowledges that it has subsequently withdrawn its appeal and FY 2000 overpayment is now finalized at $327,741, Ravenwood contends that it is inequitable to allow the State's recoupment of that money to stand since the recoupment occurred when the debt was not due.  As is discussed further above, this Court has no jurisdiction to decide whether the State adequately followed its own regulations and whether the recoupment of the $327,741 was proper prior to the conclusion of the State administrative proceedings.

[5]  The Medicare Act requires that a provider dispute a final determination of the amount of Medicare reimbursement before the Provider Reimbursement Review Board if the amount in controversy exceeds $10,000.  <u>See</u> 42 U.S.C. § 1395oo (a).  The Board's decision is reviewable by the Secretary of the Department of Health and Human Services.  <u>Id.</u> at § 1395oo (f)(1).  Only after a final agency determination may the provider seek judicial review. <u>Id.</u>

1073.  The court held that the debtor's claim arose under the Bankruptcy Code, and not the Medicare statute.  <u>Id.</u>

As in <u>University Medical Center</u>, this Court finds that the Bankruptcy Code provides jurisdiction for this dispute to the extent that there is no dispute over the <u>amount</u> that is subject to recoupment.  The amount in controversy is undisputed and the only issue before the Court is whether the State may recoup a prior Medicaid overpayment from a current payment or must "get in line" with other creditors.  If there were a dispute over the amount of money subject to recoupment, this Court would have no jurisdiction.  Similarly, this Court would not have jurisdiction to determine whether state administrative policies and procedures were followed.  However, since there is no issue as to the amount subject to recoupment, this Court has jurisdiction to determine whether recoupment is proper.

2.   <u>Sovereign Immunity</u>

The State did not appeal from the Bankruptcy Court's denial of dismissal based upon sovereign immunity. Moreover, in this appellate court, the issue was not raised until four days before the hearing.  Of course, the defense of sovereign immunity is jurisdictional and can be raised at any time, even for the first time on appeal.[6]  <u>Schlossberg v. Maryland (In re Creative</u>

---

[6]  The State filed a motion to dismiss before the Bankruptcy Court on the basis that the Eleventh Amendment to the United States Constitution grants it sovereign immunity.  The Bankruptcy Court denied the State's motion to dismiss.  Instead of appealing

<u>Goldsmiths of Washington D.C., Inc.)</u>, 119 F.3d 1140, 1144 (4th

Cir. 1997).

The State urges the Court to resolve the sovereign immunity

issue before addressing the merits of the appeal.  This approach

may well be sensible in a typical case in which sovereign

immunity is raised at a time when the issue can be fully briefed

and carefully considered prior to the appellate hearing.

In the instant case, the Court finds it appropriate to

first reach and resolve the merits of the appeal.  Having held

for the State on the merits of the appeal, the sovereign

immunity issue is - as a practical matter - moot.

If required to rule on sovereign immunity, the Court would

affirm the Bankruptcy Court's holding that Appellant's action is

not barred by the doctrine of sovereign immunity in light of

<u>Central Virginia Community College v. Katz</u>, 546 U.S. 356 (2006).


D.   <u>Ravenwood's Motion to Strike</u>

Ravenwood argues in its appeal that SB 794 funds were not

eligible for federal Medicaid matching funds and that therefore,

they were different from other Medicaid funds.  In response to

this argument, the State submitted two exhibits that were not

part of the record below.   The exhibits are both Nursing Home

_____

that decision, the State filed a new motion to dismiss before
this Court under Rule 8011 Federal Rules of Bankruptcy Procedure.

18

Transmittals dated June 22, 2001 from the Maryland Department of
Health and Mental Hygiene to Nursing Home Administrators.  Each
Nursing Home Transmittal indicates that reimbursement rates for
the nursing cost center (which was the recipient of the funds
authorized by SB 794) will be increased, with the federal and
state governments each bearing half of the reimbursement amount.
The State maintains that it did not include the two exhibits in
the record below because Ravenwood had not argued before the
Bankruptcy Court that SB 794 funds were ineligible for federal
matching Medicaid funds.

A federal court is permitted to supplement the record on
appeal when it is in the interest of justice.  See Dakota
Indus., Inc. v. Dakota Sportswear, Inc., 988 F.2d 61,63-64 (8th
Cir. 1993).  Supplementation of the record is appropriate when
there has been a mischaracterization that should be addressed.
Id.  Because it appears that SB 794 funds were, contrary to
Ravenwood's assertion, entitled to matching federal funds,
Ravenwood's motion to strike is denied.

Nevertheless, the Court does not find the issue of federal
matching funds to be meaningful to the determination of whether
recoupment was proper in this case.  Regardless of whether the
recouped funds were SB 794 funds or whether those funds received
federal matching money, the State's regulations provide for the
reconciliation of estimated payments with actual costs and the
reimbursement of overpayments.  See COMAR 10.09.10.07(C)(1);
COMAR 10.09.10.07(C)(5); COMAR 10.09.10.26(B); COMAR

10.09.36.07(B).   This process does not depend on the source of monies received by Ravenwood, _i.e._, federal or state Medicaid funds.


IV.   <u>CONCLUSION</u>

For the foregoing reasons:

    1.   The October 12, 2006 Order Granting the State of Maryland, Department of Health and Mental Hygiene's Motion for Summary Judgment shall be AFFIRMED.

    2.   A separate Order affirming the Bankruptcy Court shall be issued herewith.


SO DECIDED, on <u>Monday, June 4, 2007</u>.


                            _____/ s /_____
                                   Marvin J. Garbis
                     United States District Judge